BARNEY C. RUBEN AND ELEANOR RUBEN [1], Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent Ruben v. Commissioner
Docket No. 5788-82.
United States Tax Court
T.C. Memo 1986-260; 1986 Tax Ct. Memo LEXIS 348; 51 T.C.M. (CCH) 1268; T.C.M. (RIA) 86260; June 24, 1986. John P. Callahan, for the petitioners. Rosa Berman, for the respondent. CLAPP
MEMORANDUM FINDINGS OF FACT AND OPINION CLAPP, Judge: Respondent determined deficiencies in petitioners' Federal income tax as follows: Year
Deficiency [2]
1976
$28,323
1977
48,140
1978
35,567
*350 The issue for decision is whether petitioners' horse operations constituted an activity engaged in for profit. FINDINGS OF FACT Some of the facts have been stipulated and are found accordingly. The stipulation of facts and attached exhibits are incorporated herein by this reference. Petitioners resided in California at the time they filed their petition in this case. Petitioner-husband is a successful and busy real estate businessman. He built and sold homes and buildings for over 40 years. To conduct his real estate business, he formed the following corporations: Oxnard & Cedros Co., Inc.; Kesto, Inc.; 14830 Oxnard Street Inc.; Kester & Oxnard Co., Inc.; Kester Avenue Land Corp.; Ruben Homes, Inc.; Ruben Land Corp.; Ruben Investment Co., Inc.; and Burvan Properties, Inc. In 1972, he formed an investment company from which he received a salary ranging from $73,500 in 1972 to $100,000 in 1978. Before taking into consideration the losses and property taxes of the ranch, petitioners' adjusted gross income for 1976, 1977 and 1978, the years at issue, was $370,326, $315,544 and $370,962, respectively. In addition to petitioner-husband's real estate business, petitioners *351 were involved in breeding, boarding and racing horses. Petitioners purchased their first horse in 1943. Over the years, petitioners have owned four ranches: Van Nuys Ranch, El Bar Ranch, Running Springs Ranch at Newberry Park, California (Running Springs Rach I) and Running Springs Ranch at Santa Yuez, California (Running Springs Ranch II). Petitioners purchased the Van Nuys, Ranch in 1943. It had 60 acres of land and a one-half mile track. Petitioners subdivided the ranch and built houses on it in 1947. Petitioners purchased the El Bar Ranch in 1947. It had 40 acres of land and approximately 15 horses. Petitioner-husband did not like the location of the ranch because it was too far away from his real estate business. Petitioners sold the ranch in 1954. Petitioners purchased Running Springs Ranch I in 1954. It had 272 acres and 11 horses. The value of the land appreciated because of an increase in the population in the area and its potential for residential and/or commercial development. The value of the land did not appreciate because of its use as a horse ranch. Petitioners became dissatisfied with the location of the ranch and, in 1962, sold the ranch to a real estate *352 developer for residential and/or commercial development. Petitioners reported a gain on the sale of the ranch on the installment method. Petitioners' capital gain, and interest income on a note from the sale, was reported as follows: Year
Capital Gain
Interest
Total
1962
$ 570,363
$ 0  $ 570,363
1963
256,503
62,494
318,997
1964
256,503
98,494
354,997
1965
4,275
78,743
83,018
1966
207,156
60,572
267,728
1967
85,501
67,840
153,341
1968
85,501
60,840
146,341
1969
399,718
53,840
453,558
1970
257,905
40,044
297,949
TOTAL
$2,123,425
$522,867
$2,646,292
In 1962, petitioners purchased Running Springs Ranch II, a 1,000 acre ranch petitioner-husband still owns. It has a main residence, a pool, two detached guest bedrooms, a guest house, a manager's apartment, employee quarters, a 24 stall barn, 17 paddocks, a 4-stall broodmare barn, a 7/16 mile training track and 55 acres of pasture and grazing land. Petitioners usually stayed at the ranch from Thursday night until Monday. While at the ranch, petitioner-husband spent most of his time gardening and petitioner-wife, who had taken genetics classes, maintained breeding records *353 and filed foaling and breeding reports with various associations. Petitioner-husband was president of the California Harness Horse Breeders Association from 1953 to 1955 and a member of the California Standardbred Sires Stakes Committee from 1976 to 1978. Both petitioners were active in horse industry associations. Petitioners employed several people to assist them with the activities and record keeping of the ranch. They employed a maid who helped with the housekeeping and a ranch manager who had only an adequate reputation. Accountants maintained records of petitioners' personal, ranch and business affairs and prepared their tax returns from 1962 through 1982. Petitioner-husband did not review the tax returns prepared by his accountants but did keep some informal ranch records of his own. Petitioners did not prepare budgets for the ranch and used the same bank account for their personal and ranch expenditures. As the owners of Running Springs Ranch II, petitioners were able to breed, board and race standardbred harness horses, activities which gave petitioners a great deal of pleasure. During 1976, 1977 and 1978, petitioners owned 30 brood mares and several stallions. During *354 this same 3-year period, 48 mares were bred at the ranch. Petitioners raced 9 horses in 1976, 10 horses in 1977 and 7 horses in 1978. Breeding fees, boarding revenue, racing purses, other miscellaneous revenues, total expenses and net income for 1976, 1977 and 1978 were as follows: 1976
1977
1978
Breeding fees
$719 $3,716 $3,238 Boarding revenues
12,585 31,031 26,149 Racing purses
48,711 86,479 87,080 Other revenues
32,253 7,733 13,135 Total expenses
(135,037)
(198,914)
(181,639)
Net Income
($40,769)
($69,955)
($52,037)
An itemization of the revenues and expenses associated with Running Springs Ranch II from 1962 to 1982 follows: Line
Income:
1962
1963
1964
1965
1
Sales of Horse
$200
$1,500
$400
$1,000
2
Pasture & Boar
9,218
10,397
7,272
4,717
3
Breeding Fees
465
718
0
861
4
Racing Purses
15,835
20,059
7,609
29,508
5
Leasing & Misc
5,000
238
3,932
6
7
Total Income
$30,718
$32,674
$15,519
$40,018
8
9
Expenses
10
Advertising
11
Bad Debts
12
Blacksmith
13
Breeding Fees
14
Commissions
15
Depreciation
16
Dues & Subs.
17
Feed
18
Gas and Oil
19
Insurance
20
Misc.
21
Payroll Taxes
22
Repairs
23
Salaries
24
Seed & Fertilizer
25
Stake Fees
26
Supplies
27
Taxes & Licenses
28
Telephone
29
Training/Drivers
30
Travel
31
Trucking
32
Utilities
33
Veterinary
34
35
Total Expens
93,590
118,418
98,762
114,862
36
37
Net Income
$ -62,872
$ -85,744
$ -83,243
$ -74,844
38
*355 Line
Income:
1966
1967
1968
1969
1
Sales of Horse
$2,650
$11,625
$6,810
$12,770
2
Pasture & Boar
3,621
3,068
6,722
13,969
3
Breeding Fees
310
400
405
1,799
4
Racing Purses
37,717
5,481
834
9,695
5
Leasing & Misc
1,465
421
275
2,029
6
7
Total Income
$45,763
$20,995
$15,046
$40,262
8
9
Expenses
10
Advertising
11
Bad Debts
12
Blacksmith
930
406
13
Breeding Fees
5,150
820
14
Commissions
15
Depreciation
21,884
22,092
16
Dues & Subs.
352
319
17
Feed
5,935
7,929
18
Gas and Oil
2,709
1,372
19
Insurance
4,423
3,338
20
Misc.
151
656
21
Payroll Taxes
1,445
1,267
22
Repairs
8,493
5,151
23
Salaries
17,492
13,370
24
Seed & Fertilizer
791
522
25
Stake Fees
40
150
26
Supplies
2,568
1,435
27
Taxes & Licenses
8,612
8,757
28
Telephone
1,546
813
29
Training/Drivers
16,517
40,622
30
Travel
272
435
31
Trucking
607
2,383
32
Utilities
3,666
1,867
33
Veterinary
1,753
2,043
34
35
Total Expens
127,525
102,423
105,336
115,747
36
37
Net Income
$ -81,762
$ -81,428
$ -90,290
$ -75,485
38
*356 Line
Income
1970
1971
1972
1
Sales of Horse
$52,715
$36,000
$5,000
2
Pasture & Boar
19,216
23,584
36,475
3
Breeding Fees
3,529
818
1,788
4
Racing Purses
30,451
18,417
24,541
5
Leasing & Misc
3,456
1,162
780
6
7
Total Income
$109,367
$79,981
$68,584
8
9
Expenses
10
Advertising
325
344
11
Bad Debts
12
Blacksmith
1,116
2,312
2,855
13
Breeding Fees
200
2,229
14
Commissions
257
15
Depreciation
21,232
21,500
23,079
16
Dues & Subs.
430
1,055
2,195
17
Feed
22,829
8,051
29,149
18
Gas and Oil
1,382
1,989
3,157
19
Insurance
2,472
2,551
2,000
20
Misc.
22
21
Payroll Taxes
1,588
1,343
2,049
22
Repairs
5,285
4,782
9,353
23
Salaries
10,928
10,631
19,295
24
Seed & Fertilizer
581
747
25
Stake Fees
483
450
150
26
Supplies
267
569
2,565
27
Taxes & Licenses
218
305
164
28
Telephone
213
332
29
Training/Drivers
32,455
14,148
33,000
30
Travel
31
Trucking
1,905
2,025
1,200
32
Utilities
877
1,268
1,111
33
Veterinary
3,004
3,969
7,308
34
35
Total Expens
108,069
78,371
140,859
36
37
Net Income
$1,298
$1,610
$ -72,275
38
*357 Line
Income:
1973
1974
1975
1
Sales of Horse
$10,310
$10,849
$12,421
2
Pasture & Boar
29,404
38,028
32,957
3
Breeding Fees
925
2,720
1,175
4
Racing Purses
11,683
25,321
48,437
5
Leasing & Misc
517
212
6
7
Total Income
$52,839
$77,130
$94,990
8
9
Expenses: 10
Advertising
11
Bad Debts
1,400
12
Blacksmith
994
818
999
13
Breeding Fees
1,239
1,229
14
Commissions
15
Depreciation
23,581
21,757
21,178
16
Dues & Subs.
2,803
986
752
17
Feed
5,648
6,371
11,763
18
Gas and Oil
2,618
3,515
2,557
19
Insurance
2,364
1,716
2,041
20
Misc.
273
21
Payroll Taxes
1,321
1,335
1,290
22
Repairs
5,911
4,620
3,135
23
Salaries
16,028
17,190
15,303
24
Seed & Fertilizer
25
Stake Fees
2,740
2,700
26
Supplies
75
2,125
27
Taxes & Licens
1,273
1,300
3,363
28
Telephone
29
Training/Drive
25,861
41,425
52,747
30
Travel
31
Trucking
3,160
4,920
881
32
Utilities
1,153
1,366
1,450
33
Veterinary
4,283
3,404
2,279
34
35
Total Expense
$99,712
$114,692
$124,836
36
37
Net Income
$ -46,873
$ -37,562
$ -29,846
38
Line
Income:
1976
1977
1978
1
Sales of Horse
$32,253
$6,471
$13,135
2
Pasture & Boar
12,585
31,031
26,149
3
Breeding Fees
719
3,716
3,238
4
Racing Purses
48,711
86,479
87,080
5
Leasing & Misc
1,262
6
7
Total Income
$94,268
$128,959
$129,602
8
9
Expenses: 10
Advertising
11
Bad Debts
12
Blacksmith
51
500
13
Brooding Fees
3,646
4,274
14
Commissions
15
Depreciation
18,441
17,710
16,578
16
Dues & Subs.
597
469
884
17
Feed
8,643
2,316
11,029
18
Gas and Oil
2,267
2,221
66
19
Insurance
2,234
2,292
2,571
20
Misc.
246
35
329
21
Payroll Taxes
1,116
1,280
1,162
22
Repairs
4,532
2,306
2,384
23
Salaries
12,035
13,895
14,624
24
Seed & Fertilizer
370
350
401
25
Stake Fees
900
2,745
100
26
Supplies
3,451
9,431
27
Taxes & Licens
2,176
1,134
2,098
28
Telephone
98
139
29
Training/Drive
65,017
114,197
102,035
30
Travel
31
Trucking
6,381
15,010
11,747
32
Utilities
1,649
2,073
1,578
33
Veterinary
4,833
7,665
9,279
34
35
Total Expense
$135,037
$198,914
$181,639
36
37
Net Income
$ -40,769
$ -69,955
$ -52,037
38
*358 Line
Income:
1979
1980
1981
1982
1
Sales of Horse
$17,000
$12,570
$58,905
$34,329
2
Pasture & Boar
25,840
90,344
72,552
111,472
3
Breeding Fees
3,442
910
1,415
4,353
4
Racing Purses
28,914
18,157
27,126
68,861
5
Leasing & Misc
500
6
7
Total Income
$75,196
$122,481
$159,998
$219,015
8
9
Expenses: 10
Advertising
11
Bad Debts
12
Blacksmith
2,399
1,896
382
708
13
Breeding Fees
250
14
Commissions
3,600
6,191
9,802
4,474
15
Depreciation
15,341
14,462
18,022
11,436
16
Dues & Subs.
1,197
478
63
1,327
17
Feed
7,030
20,851
18,720
34,368
18
Gas and Oil
56
25
19
Insurance
4,666
5,017
2,971
3,016
20
Misc.
2,014
1,535
114
21
Payroll Taxes
22
Repairs
1,798
2,505
3,846
4,286
23
Salaries
28,064
32,377
34,737
32,957
24
Seed & Fertilizer
25
Stake Fees
1,620
2,865
4,625
7,575
26
Supplies
1,926
1,175
1,422
266
27
Taxes & Licens
3,186
2,848
3,296
3,274
28
Telephone
29
Training/Drive
47,524
18,040
33,705
65,388
30
Travel
31
Trucking
22,487
1,352
10,296
5,840
32
Utilities
1,574
1,858
826
1,036
33
Veterinary
4,574
1,127
2,826
1,145
34
35
Total Expense
$149,306
$114,577
$145,539
$177,235
36
37
Net Imcome
$ -74,110
$7,904
$14,459
$41,700
38
*359 As reflected in the charts, Running Springs Ranch II was not profitable. It suffered a substantial loss in each year during the 18-year period 1962-1979. In 1970 and 1971, and through 1982, petitioners' accountants improperly reported real property taxes. If the real property taxes had been properly reported, the net income of Springs Ranch II for 1970 [3] and 1971 would have been ($7,202) and ($7,060), respectively. From 1962 to 1979, Running Springs Ranch suffered total losses of over $1,000,000. The examination of petitioners' returns for the years at issue began in 1979. In 1980, Running Springs Ranch II began to show a profit. The profit was a result of a lease agreement between petitioners and the Southern California Racing Association (SCRA), the President of which was a long-time friend and business associate. Under the agreement, petitioners leased to SCRA 65 acres of pasture and other various facilities. No horses were ever *360 boarded at the ranch pursuant to the agreement. SCRA paid petitioners $36,000 in 1980 and $40,000 in each of the years 1981, 1982 and 1983. In 1984, SCRA sold its only asset and dissolved. The purchaser of SCRA's asset was the successor in interest to the lease between petitioners and SCRA. The purchaser decided it did not need the boarding facilities at Runnings Springs Ranch II and cancelled the lease in 1984. ULTIMATE FINDING OF FACT Petitioners' horse operations did not constitute an activity engaged in for profit during the years 1976, 1977 and 1978. OPINION Section 183(a) provides generally, if an activity is not engaged in for profit, no deduction attributable to such activity shall be allowed except as otherwise provided for in that section. Section 183(c) defines "activity not engaged in for profit" as "any activity other than one with respect to which deductions are allowable * * * under section 162 or * * * paragraph (1) or (2) of section 212." Section 1.183-2(b), Income Tax Regs. *361 , provides a list of nine factors to consider in the determination of whether an activity is engaged in for profit. [4] However, the resolution of the issue is to be based on all the facts and circumstances. Engdahl v. Commissioner,72 T.C. 659, 666 (1979). In order for the taxpayer to prevail, the facts and circumstances must indicate that the taxpayer entered into, or continued, the activity with an actual and honest objective of making a profit. Dreicer v. Commissioner,78 T.C. 642, 645 (1982), affd. without opinion 702 F.2d 1205 (D.C. Cir. 1983). *362 In the present case, the evidence does not support a finding that petitioners' activities were engaged in for profit. First, petitioners did not carry on the activity in a businesslike manner. Although petitioner-husband kept some informal records or notes and petitioner-wife kept breeding records, nothing in the record suggests that petitioners had anything but a vague understanding of the finances of the ranch. Petitioners did not prepare a budget for the ranch. They advertised in only two years; in 1970 they spent $325 on advertising and in 1971 they spent $344. Petitioners did not maintain a separate bank account for the ranch. Secondly, petitioners did not devote a significant amount of time to the activities of the ranch. Although they each kept some records, they usually spent only weekends at the ranch, and even then, petitioner-husband devoted most of his energies to gardening. Lack of time devoted to an activity is not necessarily indicative of a lack of profit motive where other competent and qualified people carry on the activity. Section 1.183-2(b)(3), Income Tax Regs. *363 In the present case, however, petitioners' ranch manager had only an adequate reputation and we were not informed as to the reputation of petitioners' other employees. Finally, Running Springs Ranch II suffered a loss in each year during the 18-year period 1962-1979. During this period, the losses totalled over $1,000,000. During 1976, 1977 and 1978, the years at issue, Running Springs Ranch II had a net income (loss) of ($40,769), ($69,955) and ($52,037), respectively. The only apparent rewards petitioners received from the ranch were the tax benefits associated with the losses and the personal pleasure derived from the activities of the ranch. Petitioners argue that because they reported the capital gain and interest income from the sale of Running Springs Ranch I on the installment method, their ranching operations actually were profitable from 1962 through 1970. We disagree. When land/a ranch appreciates independently of the horse related activities, the gain on the sale of the land is not taken into account when evaluating petitioner's profits and losses from their ranching operations. *364 [5] In the present case, the appreciation of Running Springs Ranch I was attributable to its potential residential and/or commercial development, not to its use as a horse ranch. Thus, the capital gain and interest income from the sale of Running Springs Ranch I should not be taken into account when evaluating petitioner's profits and losses from their ranching operations. Cf. section 1.183-1(d)(1), Income Tax Regs.
Petitioners also argue on brief that their ranch was profitable from 1980 through 1982. [6] Respondent contends that the profits in those years are a result of a bogus lease between petitioner and SCRA. We need not decide whether petitioners took steps in 1980 to make Runnings Springs Ranch II profitable or whether the lease was in fact a sham. The years at issue are 1976, 1977 and 1978. During these years, the ranch was unprofitable and petitioners were not engaged in an activity for profit. *365 Decision will be entered under Rule 155.
Footnotes
1. Mrs. Ruben died February 15, 1985 prior to trial.↩
2. In an amendment to answer, respondent alleged that the correct amounts of the deficiencies are $34,785.23, $54,976.14 and $40,282.06 for the years 1976, 1977 and 1978, respectively. The increased deficiencies are a result of respondent's shifting real property taxes associated with petitioners' ranch from Schedule A to Schedule F. Petitioner has conceded that the change is correct. Section 183(b)↩ provides that deductions attributable to an activity not engaged in for profit are allowable in a certain order, starting with deductions otherwise allowable, e.g., taxes and interest. The remaining deductions, which would be allowable if they had been incurred in an activity engaged in for profit, are then allowed to the extent that gross income from the activities exceeds the deductions which were allowed first. Here, the real property taxes shifted from Schedule A to Schedule F are deducted first and result in increased deficiencies if petitioner's activities were not engaged in for profit.
3. For any taxable year beginning after December 31, 1969, a presumption that horse related activities are engaged in for profit applies if the activities are profitable in two out of seven consecutive years. Sections 183(d) and (e)(1)↩.
4. The factors are: (1) The manner in which the taxpayer carried on the activity; (2) the expertise of the taxpayer or his advisors; (3) the time and effort expended by the taxpayer in carrying on the activity; (4) the expectation that the assets used in the activity may appreciate in value; (5) the success of the taxpayer in carrying on other similar or dissimilar activities; (6) the taxpayer's history of income or loss with respect to the activity; (7) the amount of occasional profit, if any, which is earned; (8) the financial status of the taxpayer; and (9) whether elements of personal pleasure or recreation are involved.↩
5. LaMusga v. Commissioner,T.C. Memo. 1982-742. Cf. Engdahl v. Commissioner,72 T.C. 659, 668↩ (1979) (appreciation in value of ranch based on its use as a horse ranch).
6. At trial, petitioners contended that these years were irrelevant because they dealt with years subsequent to the years at issue.↩